NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0625n.06
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 04, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ONOFRE LOPEZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| CITY OF CLEVELAND, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

**OPINION**

BEFORE:     BOGGS and DONALD, Circuit Judges; and QUIST, District Judge.[*]

QUIST, District Judge.

Cleveland police officers shot and killed Illuminado Lopez during a confrontation in which Lopez refused to drop a machete. Lopez's brother, acting as the Administrator of Lopez's estate, sued the City of Cleveland and the five officers who shot at Lopez,[1] asserting constitutional claims under 42 U.S.C. § 1983 and supplemental claims under Ohio law. After the parties conducted discovery, the district court entered summary judgment in favor of Defendants, concluding that Defendant Officers acted reasonably in using deadly force because Lopez

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

[1] The named officers are David Schramm, Amy Milner, Amy Carraway, Donato Daugenti, and Michael Tankersley.

presented an imminent threat of serious harm to someone.  Because we hold that there are disputed issues of material fact regarding whether Lopez posed a significant threat to others, we reverse the judgment of the district court.

**I.**

During the evening of July 29, 2011, Lopez was visiting his friend, Maria Cruz, at her home.  Lopez's sisters, Melba Cartagena (Melba) and Adelaida Pla, lived in the two houses on either side of the building where Cruz lived.  At some point, Lopez got into an argument with Melba's son, Samuel Cartagena (Samuel), and used a baseball bat to break the windows in Samuel's car.  Melba called the police in response to Lopez's actions.

Schramm and Milner heard a radio dispatch that an individual was threatening a family member and had a bat, and these officers were the first to arrive on the scene.  The officers found Lopez sitting in the middle of the street with a beer bottle.  At some point shortly thereafter, the officers noticed that Lopez was holding a machete, and they ordered him to drop it.  When Lopez refused to comply, Milner shot Lopez with a taser.  The taser did not affect Lopez, however, who removed the taser probes from his body.  The officers then drew their firearms and radioed for backup.

Shortly thereafter, Carraway, Daugenti, and Tankersley arrived on the scene.  The officers tased Lopez two more times, but the tasers had no effect, and Lopez cut the taser wires with his machete.  At some point, Lopez moved from the street to the sidewalk in front of Cruz's house.  The officers continued to shout at Lopez to drop the machete.

From this point on, the facts are in dispute.  Pla testified that when Lopez reached the sidewalk, she approached him and asked him to drop the machete.  During that time, she yelled to the officers that she was Lopez's sister, that he was sick, and that she could calm him down

and get the machete from him. At some point, however, she grew tired of shouting and walked toward her house. Lopez then shouted at Pla to take the machete from him, and she walked toward him, again shouting that she would get the machete. Pla testified that when she reached a point about seven feet from Lopez, he turned to his right, in her direction, with the machete at his side. At that point, the officers began to fire.

Melba and her son, Noel Cartagena (Noel), both described the moments preceding the shooting differently than Pla. Melba testified that Lopez brought the machete over his head as if he were about to harm himself, and then turned to his left, in the direction of Melba, and asked Melba if that was the way she wanted him to die. Defendant Officers then began shooting. Similarly, Noel testified that Lopez said he was going to stab himself if the officers did not shoot him, and then he brought the machete above his head, toward himself. Noel stated that Lopez was facing the officers, however, and did not turn toward either the right or left.

Defendant Officers all testified that they did not know who Pla was at the time of the shooting. They also testified that Lopez raised the machete above his head and turned toward Pla immediately before shooting, although their exact descriptions of these final moments varied slightly. Schramm testified that Lopez brought the machete over his head and turned the upper part of his body toward Pla. Similarly, Daugenti testified that Lopez raised the machete over his head while facing forward and then turned toward Pla, who was running toward Lopez. Milner testified that Pla got within five feet of Lopez, and that Lopez turned toward Pla and raised the machete over his head. Tankersley testified that Lopez turned toward Pla with the machete held over his head and made a gesture like he was swinging it at her. Finally, Carraway testified that Pla ran toward Lopez, and that Lopez raised the machete above his head in a threatening manner and turned toward her.

Officers on the scene fired at Lopez, and three bullets struck him. Plaintiff's forensic pathologist, Werner Spitz, M.D., testified that the wounds indicated that Lopez was shot from the front and did not support a conclusion that Lopez had his arms stretched above his head or that he was turned toward the right.

Plaintiff filed this action alleging that Defendants violated Lopez's Fourth Amendment right to be free from excessive force, as well as various Ohio laws. After the district court dismissed some of Plaintiff's state-law claims against Defendant City of Cleveland, the parties proceeded to discovery. Following discovery, the district court granted Defendants' motion for summary judgment on the remaining claims, holding that Defendant Officers did not violate Lopez's Fourth Amendment rights. On that basis, the district court concluded that Defendant Officers were entitled to qualified immunity and immunity under Ohio law and dismissed the claims against Defendant City of Cleveland.

**II.**

We review a district court's grant of summary judgment de novo. *Sigley v. City of Parma Heights*, 437 F.3d 527, 532 (6th Cir. 2006). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, 134 S. Ct. at 1865. Under the first prong, a court must determine whether "the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Under the second prong, a court must determine whether the right was "clearly established" at the time of the alleged violation. *Id.* at 1866. "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* This is "an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

### III.

On appeal, Plaintiff argues that the district court improperly granted summary judgment because there are genuine disputes of material fact regarding whether Defendant Officers used excessive force in shooting Lopez and whether they were entitled to immunity under Ohio law.

### A.     Fourth Amendment Excessive Force

"*[A]ll* claims that law enforcement have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court has explained that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In evaluating an excessive force claim, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-37. As such, the reasonableness standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

The Court has identified three non-exhaustive factors for lower courts to consider in determining the reasonableness of a police officer's use of force: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Graham*, 490 U.S. at 396. Nonetheless, the ultimate inquiry is "whether the totality of the circumstances" justified the use of force. *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (internal quotation marks omitted).

The central issue in this appeal is whether, viewing the evidence in the light most favorable to Lopez, Defendant Officers had probable cause to believe that Lopez posed a serious risk of harm to the officers or others. Defendant Officers testified uniformly that they believed that Pla was in imminent danger at the time they fired at Lopez. It is impossible to determine whether this belief was reasonable, however, without resolving factual disputes in the record.

These factual disputes are material because they concern the nature of any movement that Lopez may have made just before the shooting. While Defendant Officers testified that Lopez raised the machete and turned toward Pla, other witnesses described the events differently. Pla stated that Lopez turned toward her with the machete held at his side, while Melba recalled that

Lopez raised the machete and turned away from Pla (and toward Melba). Noel stated that Lopez never turned in either direction, but remained facing the officers. Moreover, Melba and Noel each testified that Lopez made statements indicating an intent to commit suicide and raised the machete as though intending to harm himself.

Defendants suggest that the force used was not excessive based on *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009). However, the circumstances of Lopez's shooting, when viewed in the light most favorable to Plaintiff, are materially different than those presented in *Chappell*. Although both cases involved a suspect who refused to drop a knife, the circumstances in *Chappell* presented a far more immediate threat of danger. In that case, there was undisputed evidence that the suspect was moving quickly toward officers with a knife held high, and "had closed to within five to seven feet in a dark, cluttered, enclosed space." *Id.* at 911. Moreover, the officers "were backed up against a wall in the small bedroom and there was no ready means of retreat or escape." *Id.* Thus, the court found that if the officers had hesitated even a second, they would have been within arm's reach of the suspect and vulnerable to serious injury. *Id.*

In this case, by contrast, the parties dispute whether Lopez made any movement at all toward Pla. Viewing the facts in the light most favorable to Plaintiff, Lopez turned his body away from Pla as she was moving toward him. Moreover, there is evidence that he did not raise the machete at all, or raised it in a way that indicated only that he intended to harm himself. In other words, there is a dispute of fact as to whether Lopez made any movement in those final moments that could reasonably be interpreted as threatening Pla.

"This Court has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." *Sova v. City of*

*Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Thus, where the reasonableness of the officers'

use of force depends on which version of the facts one accepts, "the jury, not the judge, must

determine liability." *Id.* In this case, there are contentious factual disputes about the nature of

Lopez's movements just before the shooting. Those disputes go to the heart of whether it was

reasonable for Defendant Officers to use deadly force. Because the reasonableness of their

actions depends on which version of the facts one accepts, the question must go to the jury.

Accordingly, we reverse the district court's grant of summary judgment to Defendant Officers on

Plaintiff's Fourth Amendment claim.[2]

## B.     Municipal Liability

A plaintiff seeking to hold a municipality liable for its officers' conduct must

demonstrate "(1) that a constitutional violation occurred; and (2) that the [municipality] is

responsible for that violation." *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir.

2004) (internal quotation marks omitted). The district court dismissed Plaintiff's § 1983 claim

against Defendant City of Cleveland based on its conclusion that no constitutional violation

occurred. Given our holding as to that issue, we also reverse the district court's holding on

municipal liability and remand for further consideration in light of these proceedings.

---

[2] In light of its holding that there was no constitutional violation, the district court did not
analyze the "clearly established" prong of the qualified-immunity analysis, and Defendants have
made no argument regarding that prong on appeal. Nonetheless, we note that the law was clearly
established that officers could not use deadly force unless they had probable cause to believe that
an individual posed a serious risk of harm to officers or others. *See Ciminillo v. Streicher*,
434 F.3d 461, 468 (6th Cir. 2006). Because there are disputes of fact that go directly to that
issue, Defendant Officers could not establish that they were entitled to qualified immunity based
on the "clearly established" prong. *See Tolan*, 134 S. Ct. at 1865-66 (explaining that a court may
not resolve disputes of fact under either prong of the qualified immunity analysis).

**C.** **State Law Claims**

The district court held that because Defendant Officers did not use excessive force, they were entitled to immunity under state law. In light of our holding regarding the use of excessive force, we reverse the district court's holding on this issue and remand for the district court to determine the issue of immunity under state law.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.